UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBYN DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 949 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| SOS CHILDREN'S VILLAGE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

After defendant SOS Children's Village ("SOS") terminated her employment, plaintiff Robyn Davis ("Davis") filed a four-count complaint alleging that defendant violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of her race (Count I) and violated § 1981 by retaliating against her (Count II). Plaintiff also alleges that defendant breached its contract with her (Count IV).[1] Defendant has moved for summary judgment. For the reasons set forth below, the Court grants in part and denies in part the motion.

I.  BACKGROUND

The following facts are undisputed unless otherwise noted.[2]

For roughly nine years, plaintiff Davis worked for defendant SOS as a professional foster parent. SOS hires and trains individuals to be foster parents. Many (65%) of the individuals

---

[1] On January 5, 2017, the Court dismissed Count III of plaintiff's complaint. Docket [45].
[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

SOS hires to be foster parents are, like plaintiff, African American. SOS operates three communities of homes, where it houses the foster parents it employs as well as the foster children of those foster parents.

Being a foster parent is not an easy job. Many of the foster children within SOS have suffered trauma, such as domestic violence, abuse and/or neglect. Many of the foster children act out and engage in challenging behavior, such as screaming, yelling or hitting. It is the job of the SOS foster parent to make the foster children feel safe.

At some point after Davis accepted the position with SOS, she signed an employment agreement. The employment agreement states, in relevant part:

> 4.1   In his/her capacity as a Foster Parent, Employee will report to the Village Director and be responsible for the day-to-day care and supervision of no more than six foster children as assigned by SOS. These children may be of any age, through 18. Once children are placed, they will remain in the Home with Employee unless extenuating circumstances exist as determined by the Licensing Representative, Director of Programs and Services, Clinical Director and Chief Operations Officer.
>                                               *   *   *
> 5.1   While employed as a Foster Parent, Employee may reside in the Home with his/her spouse and no more than one biological child, if applicable. Employee acknowledges that other than the Employee and the foster children, the only authorized residents of the Home is [sic] Yndia Allen.
>                                               *   *   *
> 5.5   Employee understands and acknowledges that upon termination of his/her employment (voluntary or involuntary), Employee and his/her spouse and child, if applicable, will vacate the Home within one week of the date of termination.

Employment Agreement at 2/Docket 29-1.[3]

The Department of Children and Family Services ("DCFS") generally allows each foster parent to take in up to six foster children. DCFS licenses SOS and its foster parents and

---

[3] The Court notes that in her response to defendant's statement of facts, plaintiff denied that she signed the employment agreement. Plaintiff, however, attached the employment agreement to her complaint and alleged (and thus admitted) that it is the contract between the parties. (Docket 29 at ¶ 55; Docket 29-1). Thus, the fact that plaintiff signed the employment agreement as well as the contents thereof are deemed admitted by the Court.

regulates the placement of foster children. SOS cannot return a foster child to DCFS without the approval of DCFS. SOS assigns foster children to its employees based on the availability of beds and the needs and preferences of the children or parents. One of DCFS's primary concerns is safety of the foster children.

DCFS discourages the movement of children from home to home, so SOS requires the approval of its Chief Operating Officer (who makes the decision as part of a team) before a child may be moved from one SOS home to another. Plaintiff understood that once a child was placed with her, the child would remain in her home absent extenuating circumstances.

During Davis's tenure with SOS, extenuating circumstances sometimes warranted the removal of foster children from her care. For example, once, early in plaintiff's employment, plaintiff was fostering a group of three siblings. On plaintiff's request, SOS removed the six-foot-tall, 300-pound male sibling from plaintiff's care, because plaintiff was afraid of him. Another time, SOS removed one member of a different sibling group, because he was aggressive and fighting with his sisters. SOS removed other foster children from plaintiff's home for acting out sexually or for being unable to function. SOS, however, did not always grant requests to remove children or to transfer children to other foster parents, as plaintiff eventually learned when she requested that a boy (whose initials are LP) not be returned to her home.

In or about May 2014, SOS placed in plaintiff's care two brothers, LP (who was ten years old) and EP (who was nine). The boys had suffered trauma before their placement with plaintiff, and both were difficult and violent. After about a month in plaintiff's home, EP (who was also hyper) was transferred to another foster parent, who could work with him on a one-on-one basis.

LP remained in plaintiff's home. LP's difficult behavior included fighting, cussing, damaging plaintiff's home, threatening people and taking things that did not belong to him.

3

Plaintiff testified that LP's behavior was "more than [she] was used to" but that she liked and had a connection to LP. LP expressed to plaintiff that he wanted to do better. By July 25, 2014, however, LP's behavior had gotten him admitted to a psychiatric hospital. While he was hospitalized, LP told plaintiff that he missed her and the other kids.

When LP was discharged from the hospital, he returned to plaintiff's home. For the first few days after his return, LP was quiet and in a daze. Plaintiff discussed with LP strategies (such as rewards) to manage his behavior. For a short time, LP was compliant. LP liked school and tried not to get into trouble in order to avoid returning to the psychiatric hospital; but, LP's good behavior did not last. Among other things, LP chased another child with a pair of scissors, chased a moving truck (and was nearly run over by it) and was expelled from summer camp. LP attempted to injure other children in the home by, among other things: (1) putting lotion on the floor thereby causing another child to slip and fall; and (2) tying string across the bottom of another child's bedroom door in an attempt to trip the child. LP also ran away from home and threatened to burn down plaintiff's home by turning on the gas.

Unsurprisingly, plaintiff was concerned about the safety of the other children (which included her own daughter) in her home. On September 16, 2014, SOS held a telephone conference among plaintiff, LaTonya Allen ("Allen," an SOS Case Worker Supervisor, who, like plaintiff, is African American) and Bremen Campbell ("Campbell," a Clinical Coordinator at DCFS). During the call, Campbell recommended that LP be placed in a residential group home, which is a more restrictive environment. Unfortunately, DCFS and SOS had to wait for an opening at a group home.

In the meantime, LP continued to act out (by, among other things, fighting and cussing). On September 22, 2014, LP was again placed in a hospital, where he remained until October 6,

2014. While there, LP told his therapist that he missed plaintiff and his foster brother. A few days before LP's discharge from the hospital, a doctor telephoned plaintiff. Plaintiff told the doctor that she could not handle LP and that, if it were up to her, plaintiff would not take LP back. Later that day, Shenia Lee ("Lee"), SOS's Assistant Director, went to plaintiff's home and told plaintiff she did not have the authority to tell the doctor she would not take LP back.

On October 2, 2014, plaintiff wrote Lee and Allen a letter in which she stated that she had decided not to accept LP back into her home. In her letter, plaintiff stated that she was concerned for the safety of the other children in her home. The same day, SOS held a meeting to discuss the issue. The meeting was attended by Allen, Lee, Tiffany Conroy ("Conroy," an SOS therapist), Charles Taylor ("Taylor," an SOS case manager), Nancy Martinez ("Martinez," an SOS case manager) and Deanna Jasek ("Jasek," an SOS clinical supervisor). SOS invited plaintiff, but she did not receive the voicemail until the meeting was nearly over.

Jasek took contemporaneous notes of the meeting and, two weeks later, prepared an email summarizing the discussion at the meeting. Jasek's contemporaneous notes say, among other things:

> [T]he team felt the best placement for LP was to return to the home of [plaintiff] (Plan A) and his foster siblings, as this was the only home he has known, he was demonstrating remorse when Tiffany met with him at the hospital over his behaviors and he verbalized that he missed [plaintiff] and at least one of the foster siblings. We weighed the pros and cons out of him returning to [plaintiff's] home, but ultimately felt that the pros outweighed the cons and would eliminate . . . more unnecessary trauma for LP in regards to separation[.]

In her email two weeks later, Jasek also noted that the Plan B was to place LP in the home of foster parent ST. (The parties refer to some other foster parents by their initials.) At the meeting, the group discussed providing plaintiff additional help, such as a relief parent to shadow LP on a one-on-one basis. Also at the meeting, Lee and Jasek agreed that children from

5

traumatic homes benefit from stable placements, because they need to learn that not all adults will abandon them. Although Allen was not in favor of returning LP to plaintiff's home, the recommendation from the meeting was to return LP to plaintiff's home, at least until SOS could meet with DCFS to determine whether LP could leave SOS's program.

Plaintiff testified that she believed the reason SOS wanted to place LP in her home was because of "money and stability of the agency . . . because prior to this happening to me we had got a notification in one of our meetings saying that they were not going to move any more kids until—all foster parents were coming up here asking that kids be removed, we're not moving any more kids because the agency is going to take a hit if we keep moving kids."

After the October 2, 2014 meeting, Lee and Jasek went to plaintiff's home to tell her that LP would return to her home. (On the way, they telephoned Tita Yutuc ("Yutuc," SOS's Chief Operating Officer) to inform her of the group's decision.) When Lee and Jasek reached plaintiff's home, they informed plaintiff of the decision. Lee and Jasek told plaintiff there was no other place for LP. Lee and Jasek threatened termination. Lee and Jasek did not, however, tell plaintiff that SOS planned to provide additional support, such as an additional foster parent to assist with LP.

The same day, plaintiff telephoned Yutuc and told Yutuc she would not accept LP back in her home. Yutuc told plaintiff she would speak with her in person, at plaintiff's home, the following morning. When Yutuc arrived the next morning, plaintiff adamantly refused to take LP back into her home.

Yutuc, a Pacific Islander, recommended that plaintiff's employment be terminated for refusal to take LP back into her home. On October 10, 2014, Yutuc and an SOS HR employee went to plaintiff's home to inform her that her employment was terminated. Plaintiff asked

6

Yutuc why she was doing this to plaintiff. Yutuc asked plaintiff to recall their conversation about LP. Yutuc asked plaintiff to move out of the house within three days. During the meeting, plaintiff telephoned her brother to ask him to assist her with moving out the following day. Plaintiff telephoned the CEO of SOS to request additional time to move. The CEO denied her request.

On October 11, 2014, plaintiff's brother helped her move out, and she moved additional things out on the twelfth and thirteenth of October. Because the moving truck was full, plaintiff left some items, including an armoire, behind. Plaintiff and her daughter stayed with friends and family and sometimes slept in plaintiff's car. They did not have a permanent home for about a year.

When LP was released from the hospital, he was placed with foster parent ST. The foster children who had been placed with plaintiff were placed with other foster parents on a respite basis.

A few months after plaintiff's employment was terminated, SOS terminated the employment of another professional foster parent, DS (Hispanic), when he refused to accept the return of a foster child who had been arrested and then released from jail. In discovery, defendant produced one email (recommending to the CEO that he terminate DS's employment) about DS's discharge. At some point before plaintiff's termination, after a different foster parent broke her arm and was unable to care for her foster children, a white foster parent, MD, refused to accept the temporary placement of a foster child, C, into her home. Foster child C had never before been placed with MD. SOS asked plaintiff to take foster child C, and plaintiff accepted.

Plaintiff also put forth evidence that, at a monthly meeting, some African American foster parents voiced concerns about unfair treatment. Specifically, a white foster parent, LM,

7

was given a relief parent so that she could go to the gym to exercise. African American foster parents expressed concern that LM was given special treatment. Plaintiff testified that African American foster parents were reprimanded for making inappropriate statements and that white foster parents were not. In addition, plaintiff testified that she felt disrespected when SOS's CEO, in response to a foster parent's request to move to a particular village, said, "oh, so you got out of the hood and want to go back to the hood."

## II. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III. DISCUSSION

### A. Plaintiff's Title VII disparate treatment claim

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

8

privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a).

In her complaint, plaintiff alleges that defendant violated Title VII when it terminated her employment. Plaintiff alleges that the decision was made on the basis of her race. In considering whether plaintiff's Title VII claim survives summary judgment, the Court must decide whether "'the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 808 (7th Cir. 2017) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Where, as here, the record contains no direct evidence of discrimination, a plaintiff may take advantage of the *McDonnell Douglas* burden-shifting framework by first making out a *prima facie* case of discrimination. *McKinney*, 866 F.3d at 807.

To make out a *prima facie* case of discrimination, a plaintiff must put forth evidence that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated employee outside of her protected class was treated more favorably. *McKinney*, 866 F.3d at 807. The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It requires plaintiff to show that she was "rejected under circumstances which give rise to an inference of unlawful discrimination," and the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6.

Plaintiff's evidence suffices to make out a *prima facie* case of discrimination. Until she refused LP's return to her home, plaintiff had never been disciplined. She is a member of a protected class and she has put forth evidence that another foster parent outside of her class

9

refused the placement of a foster child into her home and was not discharged. Specifically, the parties put forth evidence that, at some point (it is not clear when but it is clear that it occurred while plaintiff was still employed by SOS), foster parent MD declined to have a child placed with her temporarily while that child's foster parent recovered from a broken arm. Instead, plaintiff welcomed the foster child into her home.[4]

Defendant, in turn, has articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment. Specifically, defendant asserts that it terminated plaintiff's employment, because she refused to accept LP back into her home upon his release from the hospital. Because defendant has articulated a legitimate reason, plaintiff has the burden to show that the stated reason was pretext for discrimination on the basis of her race. *McKinney*, 866 F.3d at 807 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). A pretext is a dishonest explanation, rather than an error. *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). "It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personal management finds its comeuppance in the market rather than the courts." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (internal citations omitted); *see also Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016) (noting that the Seventh Circuit has long championed employers' rights to make their own decisions based on honest beliefs) (quoting *Green v. National Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999)).

Plaintiff has not put forth evidence that suggests defendant's reason for discharging plaintiff is pretext for race discrimination. First, plaintiff has put forth no evidence that the

---

[4] Plaintiff also argues that another foster parent, DS, rejected a foster child without consequence. The undisputed evidence, however, is that DS was terminated a few months after plaintiff for refusing to accept a foster child.

reason for her termination was dishonest. It is undisputed that plaintiff, in no uncertain terms, refused to accept LP back into her home. When Yutuc told plaintiff she was being discharged, plaintiff asked why. Yutuc told plaintiff to recall their conversation about LP. In addition, plaintiff was not the only employee defendant discharged for refusing to take back a foster child. Two months after defendant discharged plaintiff, it discharged DS for a nearly-identical infraction: DS refused to accept the return of a foster child who had been arrested and released from jail. Plaintiff put forth evidence that, at some point earlier (it is not clear when), defendant did not discharge MD when she refused to accept on a temporary basis a foster child who had never been placed with her before. As defendant points out, the foster child that MD rejected had not previously lived with MD and thus had not bonded with her, unlike the foster children DS and plaintiff refused to accept, who had already lived and bonded with DS and plaintiff, respectively.

Plaintiff also argues that defendant's decision was pretextual, because LP was dangerous. What plaintiff is basically arguing is that defendant made the wrong decision when it decided to place LP back into her care. Reasonable minds can differ on that point, but plaintiff's disagreement with defendant's decision is not evidence of pretext. *See Tibbs v. Administrative Office of the Ill. Courts*, 860 F.3d 502, 507 (7th Cir. 2017) ("Mere disagreement about the reasons . . . does not support an inference of pretext."). The undisputed evidence is that LP needed to return to SOS (at least temporarily) and that it was the judgment of the majority of the committee that it was in LP's best interest to return to plaintiff's home, where he had lived previously. Plaintiff has put forth no evidence to suggest that decision was racially-motivated. It also does not matter, as plaintiff argues, whether defendant told plaintiff the placement would have been only temporary. Perhaps plaintiff's point is that if defendant had given her more

information, she might not have refused LP's return (and, thus, might not have been discharged). She did, however, refuse, which was insubordinate.

Plaintiff also seems to be arguing that termination is too harsh a penalty for refusing to take back a troubled child. That is not a question for this Court, which is not the super-personnel department of every employer in the district. *See Tibbs*, 860 F.3d at 507 ("[T]he role of judges and juries is not to exercise our own judgment about management decisions and reasons. It is to decide whether the stated reasons were or could reasonably be found dishonest."). The only question for this Court is whether a reasonable jury could conclude that defendant discriminated against plaintiff on the basis of her race when it terminated her employment. The Court concludes that a reasonable jury could not.

Defendant is entitled to judgment as a matter of law on Count I. Defendant's motion for summary judgment is granted as to Count I.

### B. Plaintiff's retaliation claim

Section 1981 guarantees a person the same right to "make and enforce" contracts "as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Supreme Court has interpreted the language to cover claims of retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). Generally, the same standards that apply to claims for retaliation under Title VII also apply to claims for retaliation under § 1981. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) ("We generally use the same standard to review discrimination and retaliation claims under § 1981 and Title VII[.]").

To prevail on a claim of retaliation, a plaintiff must show: (1) she engaged in protected conduct; (2) she suffered an adverse action; and (3) a causal connection between the two. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). For a retaliation claim, the

necessary causal connection is but-for causation. *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (Title VII); *Cannon v. General Supply & Services, Inc.*, Case No. 15-cv-06982, 2016 WL 7339151 at *4 (N.D. Ill. 2016) (§ 1981 and Title VII).

The Court fails to find in the record any evidence that plaintiff engaged in protected conduct. In her brief, in support of her argument that she engaged in protected conduct, plaintiff cites paragraphs 24 and 25 of her statement of facts. In those paragraphs, plaintiff states: (1) that "African American foster parents voiced concerns" about a white foster parent granted a relief parent in order to exercise at the gym; and (2) that "African American foster parents felt disrespected" that they, and not white foster parents, were reprimanded for saying inappropriate things. Nowhere does plaintiff put forth any evidence that *she* voiced concerns or otherwise complained. Her argument seems to be that African American foster parents complained and she is African American; therefore, she complained. That is not logically sound. If plaintiff, herself, complained, she needed to put evidence of that fact into her statement of facts. Without evidence that she engaged in protected conduct, she cannot possibly establish that her protected conduct was the but-for cause of her termination.

Furthermore, nowhere does plaintiff say *when* the "African American foster parents voiced concerns." Even if it were logically sound to conclude that plaintiff complained, the record contains no evidence with respect to when the parents complained or, therefore, the time period that passed between when the parents complained and when plaintiff was discharged. It might have been six days or it might have been six years, so it is not possible to infer a causal connection from suspicious timing in this case. *Westlake v. City of Springfield*, 348 Fed.Appx. 155, 157 (7th Cir. 2009) ("Because [plaintiff] presented no evidence about the timing of the complaint, no causal connection can be inferred."). Plaintiff has not put forth evidence that the

African American foster parents who voiced concerns were also discharged. Such a fact would lend credence to plaintiff's theory that her discharge was retaliatory. What plaintiff puts forth, instead, is that not every SOS employee agreed that LP should be returned to her home and that she was otherwise a good employee. Neither of those facts suggests a causal connection between protected conduct and her discharge. Decisions are not discriminatory merely because they are not unanimous, and employers are allowed to discharge insubordinate employees even if they were otherwise good employees.

In sum, no reasonable jury could conclude that defendant discharged plaintiff because of her protected conduct. Defendant is entitled to judgment as a matter of law on plaintiff's retaliation claim. Defendant's motion for summary judgment is granted as to Count II.

### C. Plaintiff's breach of contract claim

Plaintiff's remaining claim, Count IV, is a state-law claim over which this Court lacks any independent jurisdictional basis. Having ruled on all the federal claims and per the general rule, the Court exercises its discretion to dismiss Count IV without prejudice. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("only in 'unusual cases' may a district court exercise its discretion to assert its supplemental jurisdiction" once federal claims have fallen out of the case before trial); *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits.").

## IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part defendant's motion for summary judgment [47]. The Court grants defendant summary judgment on Counts I and II. The Court dismisses without prejudice Count IV. Civil case terminated.


**SO ORDERED.**                                  **ENTERED:** July 17, 2018


  _____
  **JORGE L. ALONSO**
  **United States District Judge**